## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

    v.

EUGENIO GARCÍA JIMÉNEZ,

    Defendant.

Civil No. 20-1682 (ADC)

## OPINION AND ORDER

Before the Court is the Security and Exchange Commission's ("plaintiff" or "SEC")

motion for summary judgment, **ECF No. 53**, and statement of uncontested material facts

("SUMF") at **ECF No. 54**. Defendant Eugenio García Jiménez did not oppose**.**

For the reasons discussed herein, the motion for summary judgment at **ECF No. 10** is

**GRANTED**.

## I.    Procedural background

On December 1, 2020, the SEC filed the instant complaint against defendant seeking

permanent injunctive relief, disgorgement, prejudgment interest, and the imposition of a civil

penalty.[1] Plaintiff claims that defendant violated several federal statutes and complementary

---

[1] Defendant was the principal of Eugenio García Jr. & Associates, LLC ("García & Assoc."), Mayagüez Economic Development Financial Strategies, Inc. ("MEDI FS"), M.A.G. Holdings, Inc. ("MAG"), and TEGA Holdings, LLC ("TEGA"). **ECF No. 1** at 2.

regulation. **ECF No. 1**. Specifically, Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); and Rule 10b-5 thereunder, 17 C.F.R. §§ 240.10b-5; and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. §§ 80b-6(1) and (2). **ECF No. 1**.

The SEC claims that defendant acted as an investment adviser of the Mayagüez Autonomous Municipality of Puerto Rico ("Municipality"). **ECF No. 1** at 1. The complaint further asserts that defendant engaged in a fraudulent scheme involving the misappropriation of approximately $7.1 million, which involved taxpayer money. *Id*. As part of the scheme, defendant misrepresented to the Municipality that he would invest approximately $9 million of the Municipality's funds in financial products that would yield annual returns of 8-10% with no risk to the principal. *Id*. On January 28, 2021, defendant (through retained counsel) filed an answer to the complaint. **ECF No. 11**.

On March 22, 2021, defendant was indicted by a grand jury in the District of Puerto Rico charging him with one count of conspiracy to commit wire fraud, 18 U.S.C. §§ 1349 and 1343, eighteen counts of wire fraud, 18 U.S.C. § 1343, and one count of money laundering, 18 U.S.C. § 1957 for the same conduct alleged in the SEC's complaint. *See United States v. Eugenio García-Jiménez*, et al., Crim. No. 21-082-ADC. On August 25, 2022, defendant entered into a plea agreement ("plea agreement") pursuant to which he pleaded guilty to the charges in Count One (conspiracy to commit wire fraud) and Count Nineteen (money laundering). Crim. No. 21-082,

ECF Nos. 253, 257, 262. Defendant was sentenced to 63 months of imprisonment as to Count

One, and Count Nineteen, to be served concurrently, and a two-year term of supervised release.

Crim. No. 21-082, ECF No. 550.

This civil proceeding was stayed during the pendency of the criminal case. **ECF No. 42**.

Defendant's attorney was granted leave to withdraw as defendant's legal representative due to

irreconcilable differences and potential conflict of interests. **ECF Nos. 15, 16, 28, 31**.[2] The Court

granted defendant several extensions of time to announce new counsel. Despite counsel's advice

and this Court's unsolicited extensions of time, defendant has failed to announce new counsel.

On January 18, 2024, the SEC moved for summary judgment on the issue of liability. **ECF**

**Nos. 53, 54**.[3] On March 5, 2024, defendant filed a motion requesting an extension of time to file

a response. **ECF No. 55**. The Court granted defendant an extension of 45 days to file a response

or move for an additional extension if exigent circumstances so required. **ECF No. 57**. To this

date, six months later, defendant has made no filings in this case.

## II.    Legal standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). A fact meets the material bar if it has the potential to affect the outcome of the case in

---

[2] Defendant's counsel informed the Court that he had discussed with defendant the status of the case and advised defendant on the need to retain new counsel.

[3] Plaintiff certified that notice was provided to defendant via U.S. Mail to Eugenio Garcia-Jimenez Registration No. 35882-509 FCI Coleman Low Federal Correctional Institution Satellite Camp P.O. Box 1027 Coleman, FL 33521.

light of the applicable law. *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). "A

'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one

that has the potential of affecting the outcome of the case." *Id.*; *Murray v. Warren Pumps, LLC*,

821 F.3d 77, 83 (1st Cir. 2016); *Celotex Corp. v. Catlett*, 477 U.S. 317, 322-23 (1986); *see* Fed. R. Civ.

P. 56(a). Although the Court states the facts in the light most favorable to the party against whom

summary judgment is entered, the Court is still required "to determine whether either of the

parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc.*

*v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001) (citation omitted).

In order to defeat a properly supported motion for summary judgment, the non-moving

party must set forth facts showing that there is a genuine dispute for trial. *Tropigas de P.R., Inc.*

*v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011). "When a non-moving

party fails to file a timely opposition to an adversary's motion for summary judgment, the court

may consider the summary judgment motion unopposed, and take as uncontested all evidence

presented with that motion." *Pérez-Cordero v. Wal-Mart Puerto Rico*, 440 F.3d 531, 533–34 (1st Cir.

2006) (citing *NEPSK, Inc. v. Houlton*, 283 F.3d 1, 7–8 (1st Cir. 2002)). The Court must still

scrutinize the summary judgment motion under the terms of the Federal Rules of Civil

Procedure but, "[i]n most cases, a party's failure to oppose summary judgment is fatal to its

case." *Id.* at 534.

### III.    Discussion[4]

#### A.    Defendant's *pro se* status does not preclude summary judgment

##### (i)    Defendant is not entitled to *pro bono* counsel

After parting ways with his civil case attorney, defendant moved the Court to appoint *pro bono* counsel. **ECF No. 34**. That request was denied for failure to comply with Local Civil Rule 83L(g). **ECF No. 38;** *see King v. Greenblatt*, 149 F.3d 9, 14 (1st Cir. 1998) ("This being a civil case, there is no constitutional right to counsel"). Pursuant to the information available at Crim. No. 21-082, defendant's petition for appointment of counsel also failed to meet 28 U.S.C. § 1951's bar. Indeed, the information there shows, defendant went to college, obtained several finance brokerage licenses, is a sophisticated investor. He also owned and managed several corporations and high value assets, including real estate in Puerto Rico and Florida. Furthermore, defendant plead guilty to misappropriating millions of dollars through a scheme that he executed in 2018. More importantly, as discussed further below, defendant funneled substantial amounts of the Municipality's funds to his private corporations. *See* Crim No. 21-082. Thus, defendant fails to meet 28 U.S.C. § 1915(e)(1)'s indigent requirement.

##### (ii)    Defendant's *pro se* status does not preclude summary judgment

Although courts construe a *pro se* plaintiff's filings liberally, "there is a long line of authority rejecting the notion that pro se litigants in [] civil… cases are entitled to extra procedural swaddling." *Eagle Eye Fishing Corp. v. U.S. Dept. of Commerce*, 20 F.3d 503, 506 (1st

---

[4] Because the facts of this case are not extensive, the Court will consolidate the factual findings with the discussion.

Cir. 1994). "[A] litigant's pro se status does not absolve him from compliance with the

Federal Rules of Civil Procedure. This applies with equal force to a district court's

procedural rules." *F.D.I.C. v. Anchor Properties*, 13 F.3d 27, 31 (1st Cir. 1994)(cleaned up); *Posadas*

*de Puerto Rico, Inc. v. Radín,* 856 F.2d 399, 401 (1st Cir. 1988); *Más Marqués v. Digital Equipment*

*Corp.,* 637 F.2d 24, 27 (1st Cir. 1980).

The Court is aware and mindful that it should be "solicitous of the obstacles that pro se

litigants face, and while such litigants are not exempt from procedural rules, we hold pro se

pleadings to less demanding standards than those drafted by lawyers and endeavor, within

reasonable limits, to guard against the loss of pro se claims due to technical defects." *Dutil v.*

*Murphy*, 550 F.3d 154, 158 (1st Cir. 2008). However, this case is certainly not one where summary

judgment befalls against a *pro se* litigant due to technical difficulties. Instead, aside from the facts

being undisputed (since they are admitted in defendant's criminal plea agreement), defendant

has been granted more than a year to announce new legal representation, to inform whether or

not he agreed with plaintiff's settlement offer, or to "move forward with the proceedings." *See*

**ECF No. 31**. In addition, since October 27, 2022, defendant was warned that failure to comply

with the Court's order "will entail sanctions including but not limited to entry of default." *Id*.

## B.    Collateral estoppel

In any event, and perhaps more importantly for present purposes, defendant is

collaterally estopped from re-litigating, now in the civil context, the material issues of fact

necessary to issue summary judgment in the SEC's favor.[5] "'Collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *Ashe v. Swenson*, 397 U.S. 436, 443 (1970). Specifically, it "bars parties from re-litigating issues of either fact or law that were adjudicated in an earlier proceeding where the current litigation involves a party to the earlier proceeding." *Securities and Exchange Commission v. Chan*, 465 F.Supp. 3d 18 (2020)(quoting *Robb Evans & Assocs., LLC v. United States*, 850 F.3d 24, 31 (1st Cir. 2017); *see One Lot Emerald Cut Stones and One Ring v. U.S.*, 409 U.S. 232, 234 (1972).

Although originally developed for civil litigation, for many years it has been applied both in civil and criminal proceedings. *See Frank v. Mangum*, 237 U.S. 309 (1915). And it cuts either against the defendant or the government. *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 568 (1951)("It is well established that a prior criminal conviction may work an estoppel in favor of the Government in a subsequent civil proceeding.").

Generally, the party moving for the application of collateral estoppel against its adversary needs to establish that:

> (1) the issue sought to be precluded in the later action is the same as that
> involved in the earlier action; (2) the issue was actually litigated; (3) the

---

[5] *Securities and Exchange Commission v. Chan,* 465 Fed. Supp. 3d 18 (1st Cir. 2022)(affirming the District Court's issuance summary judgment in favor of the SEC under collateral estoppel "due to the fact that [pro se defendant] had been convicted on two counts of securities fraud based on the same facts."). First Circuit Local Rule 32.1.0(a).

issue was determined by a valid and binding final judgment; and (4) the determination of the issue was essential to the judgment.

*Ramallo Bros. Printing, Inc. v. El Día, Inc.*, 490 F.3d 86, 90 (1st Cir. 2007).

More importantly, collateral estoppel has been consistently held to apply in favor of the SEC where the defendant has been convicted and sued for civil liability for the same or related conduct.[6] Specifically, "a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case." *S.E.C. v. Freeman*, 290 F.Supp.2d 401, 404 (S.D.N.Y.,2003)(quoting *United States v. Podell*, 572 F.2d 31, 35 (2nd Cir. 1978)); *Securities and Exchange Commission v. Chan*, 465 Fed. Supp. 3d 18 ("district court found [*pro se*] defendant collaterally estopped from contesting civil liability [asserted by the SEC in a motion for summary judgment] in the underlying action due to the fact that he had been convicted on two counts of securities fraud based on the same facts. After careful review of the record and the parties' submissions, we affirm."); *Securities and Exchange Commission v. Muraca*, 2019 WL 6619297, at *5 (D. Mass., 2019); *Securities and Exchange Commission v. Weed*, 315 F.Supp.3d 667, 674 (D. Mass., 2018)("Courts routinely hold that a defendant convicted in a criminal proceeding is collaterally

---

[6] *Securities and Exchange Commission v. Weed*, 315 F.Supp.3d 667, 675 (D. Mass., 2018)("Weed's contention that collateral estoppel cannot apply because the civil complaint contains additional allegations that were not prosecuted in the criminal case is erroneous.")

estopped from re-litigating the operative facts in a subsequent civil proceeding" initiated by the

SEC).

In light of all the above, the Court will consider the undisputed material facts contained

in defendant's plea agreement. **ECF No. 53**.

### C.    Uncontested material facts

Based on defendant's plea agreement, Crim Case 21-082, ECF No. 253, as well as the

evidence put forth by plaintiff at **ECF Nos. 53, 54**, the following facts are undisputed for Fed. R.

Civ. P. 56 purposes.

Defendant was the principal of Eugenio García Jr. & Associates, LLC ("García & Assoc.").

**ECF No. 54-1**. Since at least 2014, defendant, through García & Assoc., held himself out as an

"Investment and Capital Municipal Advis[e]r" specializing in assisting municipalities in

facilitating investment in public development through the establishment of business relations

with potential investors. **ECF No. 54-2**. Defendant also claimed that he was a "Licensed Financial

Advis[e]r in Investment and Capital (MSRB D00B1B) for municipalities." *Id*.

In March 2014, defendant and the Municipality executed an agreement (herein, the

"contract") in which defendant agreed to provide, among other things, advice on trading

platforms, risk and earnings analyses, and updates to the Municipality's banking and

investment strategies including ways to improve yields and general return on investments. **ECF**

**No. 54-3**, Declaration of Yahaira M. Valentín ("Valentín") at ¶1 and Exhibit 1 thereto; **ECF No.**

**54-4**. The contract also stated, "[a]ll [a]dvise [sic] given will be governed by the . . . Investment

Advis[e]r[s] Act [of] 1940." *Id*. at 1. Defendant's contract was renewed annually until 2018. **ECF No. 54-3.** Declaration of Valentín at ¶3. In exchange for his services, defendant was paid between $100- $125/hour and the Municipality would cover his expenses. *Id*. Over the course of the relationship, the Municipality paid defendant over $300,000. **ECF No. 54-5**.

In 2014, defendant advised the Municipality to create and incorporate Mayaguez Economic Development, Inc. ("MEDI"), a "for profit" Puerto Rico Municipal Enterprise, for the general purpose of generating economic investment and development. **ECF No. 54-3** at ¶4. Following defendant's advice, the Municipality, through its municipal legislature, created MEDI in April 2014. **ECF No. 54-3; 54-6.** In his consultant role, defendant identified approximately $9 million in unused funds in the Municipality's accounts. **ECF No. 54-3.** These funds were appropriated by the Commonwealth's government and were earmarked for various municipal projects, among them a "Mayaguez Trauma Center." *Id*. In 2016, defendant made a proposal to aggregate the $9 million in funds to invest them. Defendant promised to obtain sufficient returns to fully fund some of the Municipality's projects, aside from the construction of the new trauma center. *Id*. at ¶6. Specifically, defendant stated that he could invest the $9 million and obtain an annual return of 8-10% for two years with the principal guaranteed. *Id*. at ¶7.

As part of his scheme, in March 2016, defendant provided the Municipality with a fake letter purportedly from "Union Bank," a California financial institution (herein, "Brokerage Firm 1"). The letter stated that the investment had a "projected rate of return of approximately 8-10% per annum." *Id*. at ¶7 and Exhibit 2 thereto, **ECF No. 54-3** at 13. Based on defendant's

representations, the Municipality agreed in March 2016 to allow defendant to invest the $9 million through MEDI. **ECF No. 54-3** at ¶¶7-8. Defendant had complete control and called the shots in the investment decisions regarding the $9 million. *Id*., at ¶9.

After obtaining the Municipality's approval, defendant provided the Municipality's Finance Director with Brokerage Firm 1 account opening forms, which the Finance Director completed on behalf of MEDI and returned to defendant. **ECF No. 54-3** at ¶10; **ECF No. 54-7**. Defendant submitted to Brokerage Firm 1 a different set of account opening documents for the MEDI account, including corporate documents and authorizations. **ECF No. 54-8**. Based on defendant's representations and documents, Brokerage Firm 1 opened a brokerage account in MEDI's name. **ECF No. 54-9**. Two weeks later, at defendant's request, the Municipality wired $9 million to fund MEDI's Brokerage Firm 1 account. **ECF No. 54-3** at ¶10.

Among defendant's misrepresentations that caused the opening of the investment account and the transfer of the $9 million, defendant represented that the source of the $9 million was "Personal Income/Business Revenue and Savings," that MEDI had a physical and mailing address in Newport Beach, California, that defendant MEDI had $1 million in annual income, and that it had a net worth of $270 million. **ECF No. 54-8**.

On or about March 31, 2016, instead of buying the investment "products" he promised the Municipality, defendant purchased $9 million in U.S. Treasury notes ("Treasury notes") in MEDI's Brokerage Firm 1 account. **ECF No. 54-9**. Unbeknown to the Municipality, defendant also opened a margin account to obtain a margin loan. In order to do so, defendant pledged the

**Civil No. 20-1682 (ADC)** **Page 12**

$9 million in assets as collateral for the margin loan. **ECF Nos. 54-10**, **54-11**.[7] Beginning on or about April 1 through 20, 2016, using the margin loan funds, defendant made several wire transfers out of Brokerage Firm 1: $250,000 to M.A.G. Holdings, Inc. on April 1, 2016; $450,000 to MAG on April 1, 2016; $900,000 to TEGA Holdings, LLC ("TEGA") on April 4, 2016; and $2.5 million to Mayaguez Economic Development Financial Strategies, Inc. ("MEDI FS") between April 12-20, 2016. **ECF No. 54-9, 54-12.**

These accounts were all under defendant's control. To wit, defendant was the principal of MAG and MEDI FS and the co-owner of TEGA. **ECF Nos. 54-11** at 14, 15, 18; **54-13**; **54-14; 54-15**. In late April 2016, based on the MEDI account's listed investment objective and risk tolerance, Brokerage Firm 1's Anti Money Laundering Officer ("AMLO") questioned the account's wire activity and defendant's investment strategy. **ECF No. 54-16**. Brokerage Firm 1's AMLO flagged defendant's strategy noting that MEDI was paying a higher interest rate on the margin loan than the rate it was earning on the Treasury notes. **ECF No. 54-17**. Brokerage Firm 1's management gave notice to defendant of their concerns and informed that they would close the account. *Id*. Accordingly, on or about May 2, 2016, Brokerage Firm 1 sent a letter to the Newport Beach

---

[7] *See* **ECF No. 54-11,** Defendant's deposition transcript at 48:11-49:12. Defendant invoked the Fifth Amendment right against self-incrimination, which allows the Court, if needed, to draw adverse inferences against defendant for purposes of summary judgment. *See SEC v. Druffner*, 517 F.Supp.2d 502, 511 (D. Mass. 2007) (the record evidence, "combined with the defendant's invocation of his Fifth Amendment privilege, leads the Court to the conclusion that the defendant violated the statutes in question and summary judgment is, therefore, appropriate"); *see also SEC v. Colello*, 139 F.3d 674, 678 (9th Cir. 1998).

mailing address provided by defendant stating Brokerage Firm 1's intent to close the account. *Id*.

That same month, defendant transferred the MEDI account funds at Brokerage Firm 1 to another registered broker-dealer ("Brokerage Firm 2"). Using the same *modus operandi*, as before, defendant submitted a margin loan application in the name of MEDI with Brokerage Firm 2. **ECF No. 54-17**. While the transfer of MEDI's account funds was pending, Brokerage Firm 2's due diligence team requested clarification on the relationship between MEDI and the Municipality. **ECF No. 54-18**. In response to this inquiry, defendant misrepresented to Brokerage Firm 2 that there was no formal relationship between MEDI and the Municipality, that MEDI was a private company formed to deal in real estate, and that MEDI relied on its own assets, among other lies. Defendant also provided Brokerage Firm 2 with a fake "Shareholder Ledger" showing he was a 100% owner of MEDI. *Id.*, at 4.

Still unsatisfied with defendant's assertions, Brokerage Firm 2 made additional inquiries. Defendant responded by providing information on MEDI FS, a separate entity owned by defendant. *Id*. He also provided Brokerage Firm 2 with MEDI FS's shareholder ledger and, eventually, amended the account opening documents to reflect MEDI FS as the account holder instead of MEDI. Based on these representations, Brokerage Firm 2 proceeded to open a brokerage account and a margin account in the name of MEDI FS with the amended account opening documents, which still listed Newport Beach, California address rather than a Mayagüez, Puerto Rico location. **ECF No. 54-19**.

In June 2016, Treasury notes from the MEDI account at Brokerage Firm 1 were transferred to the MEDI FS account at Brokerage Firm 2 to fund the account. **ECF No. 54-19**. Additionally, the $4.1 million margin liability at Brokerage Firm 1 was satisfied by leveraging the new MEDI FS margin account at Brokerage Firm 2. *Id*. On or about June 21 and July 6, 2016, defendant wired an additional $3.15 million using a margin loan at Brokerage Firm 2 to MEDI FS's bank account. **ECF No. 54-17**.

On or around July 2016, Brokerage Firm 2 reviewed MEDI FS's accounts, froze wire activity, ultimately liquidated the Treasury notes to satisfy the margin call, and sent MEDI FS a $1.7 million check representing the balance in the account. **ECF No. 54-19, ECF No. 54-20** at 2, 3. Defendant then caused the $1.7 million check to be deposited into MEDI FS's bank account at Wells Fargo. **ECF No. 54-21** at 27.

From MEDI FS's bank account, defendant directed over $2.28 million in payments to entities and accounts he controlled or with which he was affiliated. **ECF No. 54-21, 54-11** at 28-29. He also directed the remaining millions in payments to other unrelated entities for the purpose of investing the Municipality's funds. *Id*. By the end of December 2016, MEDI FS's bank account had a zero balance. **ECF No. 54-21** at 34-35.

To conceal all these fund movements and his grand plan, in June 2016, defendant wired the Municipality $1.8 million using funds borrowed on margin from the Brokerage Firm 2 account. **ECF No. 54-19**; **54-3** at ¶11. Defendant told the Municipality that the $1.8 million transfer was an "advance" on the interest he promised. **ECF No. 54-3** at ¶11. However, defendant

did not disclose to the Municipality that he made the "advance" using funds secured through a margin loan and that he had already misappropriated a substantial portion of the funds the Municipality had entrusted to him. *Id*.

The Municipality did not receive account statements from Brokerage Firm 1 or Brokerage Firm 2. **ECF No. 54-3** at ¶12. Defendant did not provide legitimate account statements to the Municipality. *Id*. The only time the Municipality received an account statement was at the request of Municipality's Finance Director. In response to this request, defendant furnished a fictitious August 2016 statement purporting to be from "Leyton Suisse Investment Advisors" reflecting an account balance of $8,976,297.61. **ECF No. 54-3** at ¶12; **54-3** at 17-25.

With the Municipality's $9 million investment gone, defendant continued to conceal his scheme by repeatedly attempting to convince the Municipality to reinvest the $9 million for an additional term of three to five years. **ECF No. 54-3** at ¶14. On or around March 2018, as the end of the two-year investment term approached, the Municipality's Finance Director repeatedly asked defendant about the necessary steps for the return of the $9 million principal, which defendant promised would be guaranteed. **ECF No. 54-3** at ¶14. Defendant misrepresented that he would return the principal investment within 60 days, but he never did. **ECF No. 54-3** ¶¶15-16. The Finance Director and Mayor made several other demands to defendant for information and documentation of the investment to no avail. *Id*.

    **D.**         **Defendant's violation of Securities Act § 17(a)(1) and Exchange Act § 10(b)**

To establish a violation of Securities Act § 17(a)(1) and Exchange Act § 10(b), or of Rule 10b-5 thereunder, plaintiff must show that defendant: (i) engaged in a device, scheme, or artifice to defraud or made materially false misrepresentations or misleading omissions; (ii) with scienter; (iii) in the offer or sale of securities as to Section 17(a)(1), or in connection with the purchase or sale of securities as to Section 10(b) and Rule 10b-5; and (iv) by the use of an instrumentality of interstate commerce, such as the mails or wires. *See* 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *see SEC v. Ficken*, 546 F.3d 45, 47 (1st Cir. 2008); *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 766 (11th Cir. 2007).

As an adviser, defendant convinced the Municipality to allow him (through MEDI) to invest $9 million for two years at an annual return of 8-10%. *See SEC v. Zanford*, 535 U.S. 813, 821-822 (2002) (misappropriation of client's securities for personal use states a claim for scheme to defraud). However, instead of investing the funds, defendant purchased $9 million of U.S. Treasury notes with the Municipality's funds, took out margin loans at two brokerage firms, and misappropriated approximately $7.1 million of the funds through a series of wire transfers to entities he controlled. To conceal his fraud, defendant transmitted $1.8 million to the Municipality as a purported return on the investments and provided false account statements.

The misrepresentations as to the true intentions and use of the funds were material. *See SEC v. Monterosso*, 768 F. Supp. 2d 1244, 1263 (S.D. Fla. 2011), aff'd 756 F.3d 1326 (11th Cir. 2014) ("disclosure of the omitted fact would have been viewed by the reasonable shareholder as

having significantly altered the 'total mix of information available.'" ); *see, e.g., SEC v. Smart*, 678 F.3d.850, 857 (10th Cir. 2012) (the fact money was not being used as represented would be material to a reasonable investor).

The nuts and bolts of the scheme also denote the way defendant conducted his actions with scienter or, in the alternative, with negligence, which is also a violation of the Securities Act § 17(a)(1), Exchange Act § 10(b), and Rule 10b-5. *See S.E.C. v. Sicken*, 546 F.3d 45, 47 (1st Cir. 2008)("[i]n this circuit, proving scienter requires "a showing of either conscious intent to defraud or 'a high degree of recklessness."). Defendant knew his representations about the use of the funds and performance of the investment were false. For example, defendant submitted false account opening documents to the brokerage firms, margined the brokerage accounts, wired the money to bank accounts of entities he controlled, lied to the Municipality about the source of the purported $1.8 million return on its investment, and provided with false information to further cover up his lies.

Securities Act § 17(a)(1)'s "in the offer or sale," and Exchange Act § 10(b)'s "in connection with the purchase or sale" of security requirements are to be read broadly. *See United States v. Naftalin*, 441 U.S. 768, 773-75 (1979). Thus, in light of the facts outlined above, including the fact that defendant pledged the U.S. Treasury notes as collateral for a margin loan, these requirements are met. *See Rubin v. U.S.*, 449 U.S. 424, 429 (1981). Lastly, defendant used channels in the interstate commerce to achieve his fraudulent goals. For example, defendant caused funds to be transferred through wire in order to reach his corporations. Accordingly, all four elements

of Securities Act § 17(a)(1), Exchange Act § 10(b), and Rule 10b-5 are met here in light of he

undisputed and admitted facts.

### E.       Defendant's violation of the Advisers Act

The Advisers Act establishes a statutory fiduciary duty for investment advisers to act for

the benefit of their clients. *See Transamerica Mortgage Adviser, Inc. v. Lewis*, 444 U.S. 11, 17 (1979).

Under the Advisers Act, an "investment adviser" is "any person who, for compensation, engages

in the business of advising others, either directly or through publications or writings, as to the

value of securities or as to the advisability of investing in, purchasing, or selling securities." 15

U.S.C. § 80b-2(a)(11). The general definition of an "investment adviser" is broad. *Thomas v.*

*Metropolitan Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011).

For years, defendant acted as an investment adviser to the Municipality, and he was paid

for that job. In those years, defendant orchestrated and directed the investment of the $9 million.

He then relayed false information to the parties on both sides of his scheme. His

misrepresentations, lies, and schemes as an "adviser" to misappropriate the Municipality's

funds constitute violations of Sections 206(1) and 206(2) of the Advisers Act.

## VI.    CONCLUSION

In light of all the above, the Court **GRANTS** plaintiff's motion for summary judgment at

**ECF No. 53**, and finds, inter alia, that defendant committed violations of Sections 17(a)(1),

17(a)(2) and 17(a)(3) of the Securities Act; as well violations of Section 10(b) of the Exchange Act

and Rules 10b-5(a), 10b-5(b) and 10b5(c) thereunder; Count VII, alleging violation of Section

206(1) of the Advisers Act; and Count VIII, allegation violation of Section 206(2) of the Advisers

Act.

Plaintiff is ordered to move forward with the remaining issues in this case. To that end,

plaintiff is granted 20 days to move for damages or any relief.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 30th day of September, 2024.

> **S/AIDA M. DELGADO-COLÓN**
> **United States District Judge**